NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TEAM WORLDWIDE CORPORATION,**
*Appellant*

**v.**

**INTEX RECREATION CORP.,**
*Appellee*

---

2020-1975

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. PGR2019-00015.

---

Decided: September 9, 2021

---

ROBERT M. HARKINS, JR., RuyakCherian LLP, Berkeley, CA, argued for appellant. Also represented by TIMOTHY E. BIANCHI, Schwegman Lundberg & Woessner, PA, Minneapolis, MN.

JOEL SAYRES, Faegre Drinker Biddle & Reath LLP, Denver, CO, argued for appellee. Also represented by R. TREVOR CARTER, REID E. DODGE, ANDREW M. MCCOY, Indianapolis, IN.

---

Before NEWMAN, TARANTO, and CHEN, *Circuit Judges.*

CHEN, *Circuit Judge.*

Team Worldwide Corporation (TWW) appeals a post-grant review decision of the Patent Trial and Appeal Board (Board) finding claims 1–5 of U.S. Patent No. 9,989,979 ('979 patent) unpatentable as indefinite under 35 U.S.C. § 112(b).[1] The Board construed the claim term "pressure controlling assembly" as a means-plus-function limitation under § 112(f) and determined the patent failed to disclose structure to perform each recited function of the assembly limitation, as claimed. The '979 patent's filing date is August 29, 2014, making it subject to the American Invents Act (AIA) unless it can properly claim priority from an earlier-filed, pre-AIA patent application. The Board found the specification, shared with an earlier pre-AIA patent application from which the '979 patent claims priority, lacks adequate written description to support that the inventor possessed the claimed "pressure controlling assembly" at the filing date of either application. The Board therefore concluded that the challenged claims are eligible for post-grant review as they could not claim priority from the pre-AIA application. We *affirm*.

BACKGROUND

A

TWW filed the application that issued as the '979 patent on August 29, 2014. The patent is directed to an "inflating module" that automatically maintains the air pressure in an inflatable device, e.g., an air mattress,

---

[1] As the grounds for unpatentability at issue here are premised on the '979 patent being eligible for post-grant review and thus governed by the America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284 (2011), we refer to the AIA version of § 112 in this opinion.

within a given range.  *See* '979 patent at Abstract.  The '979 patent briefly refers to the inflating module having a "pressure controlling assembly" that "monitor[s] air pressure in the inflatable object," "automatically activate[s] [a] supplemental air pressure providing device when . . . the air pressure inside the inflatable object decreases below a predetermined threshold," and "control[s] the supplemental air pressure providing device to provide air pressure to the inflatable object so as to maintain the air pressure of the inflatable object within a predetermined range."  *Id.* at col. 1 l. 66–col. 2 l. 15 and claim 1.  Claim 1 of the '979 patent, the only independent claim at issue, is reproduced below.

> 1.  An inflating module adapted to an inflatable object comprising an inflatable body, the inflating module used in conjunction with a pump that provides primary air pressure and comprising:
>
> a *pressure controlling assembly* configured to monitor air pressure in the inflatable object after the inflatable body has been inflated by the pump; and
>
> a supplemental air pressure providing device, wherein the *pressure controlling assembly* is configured to automatically activate the supplemental air pressure providing device when the pressure controlling assembly detects that the air pressure inside the inflatable object decreases below a predetermined threshold after inflation by the pump, and to control the supplemental air pressure providing device to provide supplemental air pressure to the inflatable object so as to maintain the air pressure of the inflatable object within a predetermined range.

'979 patent at claim 1 (emphases added).

The '979 patent specification describes the pressure controlling assembly almost exclusively in functional

terms.  *See id.* at Abstract; *id.* at col. 1. l. 66–col. 2. l. 15. One sentence of the specification, however, states that "[a]fter the supplemental air pressure providing device is in a standby mode, a pressure controlling assembly 121/122 as described starts monitoring air pressure in the inflatable object."  *Id.* at col. 4 ll. 48–51.  The specification makes no further mention of a pressure controlling assembly and provides no explanation of what elements 121 and 122 are, beyond what is shown in Figure 2a:



Fig 2a

The '979 patent claims priority from U.S. Patent Application No. 13/112,847 ('847 application), filed May 20, 2011.  As filed, the '847 application had a disclosure nearly identical to that in the '979 patent, *compare* '979 patent *with* J.A. 1096–98, though the '847 application did not associate the pressure controlling assembly with elements 121 and 122.  *See* J.A. 1097, 1099–1103.  During the prosecution of the '979 patent, the applicant, at the request of the examiner, edited the specification of the '979 patent to associate elements 121/122 with the pressure controlling assembly.  *See* J.A. 1189.

The '847 parent application and '979 patent each claim priority from a Chinese patent application, CN 201010186302 (CN '302 application), filed May 21, 2010. Despite the priority claims, neither the '847 application nor the '979 patent incorporate the contents of the CN '302 application by reference. The CN '302 application contains the same figures as the '847 application and the '979 patent, but provides considerably more detail about the relevant pressure control element; it describes how an "air pressure control mechanism," including "air valve plate 121" and "chamber 122," moves in response to changing air pressure within the attached inflatable device. *See* J.A. 2137. The CN '302 application also describes the operation of a switch 13, disclosing that "[w]hen the air pressure value inside the inflatable product is greater than the reset mechanism's preset value, the air pressure control mechanism shifts upward, the second switch 13 is closed by the projection pressing against it, and the automatic reinflation mechanism halts reinflation." J.A. 2136. In contrast, "[w]hen the air pressure value inside the inflatable product is less than the reset mechanism's preset value, the air pressure control mechanism shifts downward, the projection is removed from second switch 13 causing it to disconnect, and the automatic reinflation mechanism starts reinflation." *Id.* Neither the structural descriptions of the "air pressure control mechanism" or the switch 13 nor their operation are included in the shared specifications of the '847 application and '979 patent.

B

Intex Recreation Corp. (Intex) filed a petition for post-grant review of claims 1–5 of the '979 patent. Intex argued that the '979 patent was eligible for post-grant review because the '847 parent application failed to provide written description support for the challenged claims, and therefore the 979 patent claims cannot properly claim priority to

a pre-AIA application.[2]  Intex alleged claims 1–5 were unpatentable under § 112(b) because "pressure controlling assembly" was a means-plus-function claim term and the specification failed to identify structure corresponding to each of that term's functions recited in the claims.  Intex also asserted that the claims were unpatentable under § 112(a) for failing to comply with the written description requirement due to the specification's lack of disclosure for the pressure controlling assembly claim element.[3]

In its Final Written Decision, the Board determined that Intex had met its burden to show that the '979 patent is eligible for post-grant review and that claims 1–5 are unpatentable.  *See Intex Recreation Corp. v. Team Worldwide Corp.*, PGR2019-00015, 2020 WL 2071543, at \*1 (P.T.A.B. Apr. 29, 2020) (*Board Decision*).  The Board recognized that the patent's eligibility for post-grant review was a threshold issue because, although the application that issued as the '979 patent was filed after the effective date of the AIA, it claimed priority to the pre-AIA '847 application.  *See id.* at \*4.  The Board noted that the '979 patent would not be eligible for post-grant review "if the claimed subject matter

---

[2]    Post-grant review is only available for patents subject to the first-to-file provisions of the AIA.  *See* AIA § 6(f)(2)(A).  In other words, post-grant review is available for patents containing at least one claim with an effective filing date after the effective date of the AIA—March 16, 2013.  Because the '979 patent was filed after March 16, 2013, post-grant review is available unless each of its claims is supported by the '847 application from which it claims priority.

[3]    Intex asserted several other grounds for unpatentability, including anticipation and obviousness in view of several prior art references.  The Board did not reach these prior-art based grounds, J.A. 73, and they are not at issue on appeal.

complies with the written description and enablement re-
quirements of § 112(a) for an ancestor application *filed
prior to March 16, 2013.*" *Id.*

To determine whether the challenged claims had writ-
ten description support in the '847 application,[4] the Board
first construed the claims. *See id.* at *5 ("Where the claims
have not been properly construed, the full scope of the
claim is unknown, thereby rendering baseless any determi-
nation of written description support in an earlier patent."
(quoting *X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757
F.3d 1358, 1365 (Fed. Cir. 2014))).

The Board construed the term "pressure controlling as-
sembly" as invoking § 112(f). Applying *Williamson v. Citrix
Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en
banc), the Board found that the presumption against con-
struing a claim term lacking the word "means" as invoking
§ 112(f) was overcome, concluding that, in view of the rec-
ord, the claim term in question lacks a sufficiently definite

---

[4] The Board did not analyze whether the CN '302 ap-
plication provided written description support for the
claims. *See id.* at *5 n. 8. As it correctly noted, each appli-
cation in the priority chain must have written description
support for the claims. *See Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565, 1571 (Fed. Cir. 1997) ("In order to gain the
benefit of the filing date of an earlier application under
35 U.S.C. § 120, each application in the chain leading back
to the earlier application must comply with the written de-
scription requirement of 35 U.S.C. § 112."). Thus, "[i]f the
'847 application does not provide adequate written descrip-
tion support for any claim of the '979 patent, then the '847
application has broken the priority chain with respect to
that claim and any disclosure in the CN '302 application
cannot cure that break." *Board Decision* at *5 n.8.

meaning to persons of skill in the art. *Board Decision* at
*8.

The Board then identified the four claimed functions of
the "pressure controlling assembly":

> (1) monitoring air pressure in the inflatable object
> after the inflatable body has been inflated by the
> pump; (2) detecting that the air pressure inside the
> inflatable object decreases below a predetermined
> threshold after inflation by the pump; (3) automat-
> ically activating the supplemental air pressure
> providing device when the pressure controlling as-
> sembly detects that the air pressure inside the in-
> flatable object decreases below the predetermined
> threshold after inflation by the pump; and (4) con-
> trolling the supplemental air pressure providing
> device to provide supplemental air pressure to the
> inflatable object so as to maintain the air pressure
> of the inflatable object within a predetermined
> range.

*Id.* at *20.

The Board next attempted to identify the structure dis-
closed in the specification that performed each function.
Focusing on the third function, "automatically activating
the supplemental air pressure providing device," the Board
concluded that the patent failed to disclose any correspond-
ing structure for its performance. *See Board Decision* at
*23. Specifically, the Board noted that TWW's proposed
structure for this function hinged entirely on its expert's
conclusory testimony about how a skilled artisan would in-
terpret Figures 1 and 2a of the patent. *See id.* ("Dr. Stevick
provides no basis for the testimony and the testimony is not
supported by figures."). Dr. Stevick's theory relied on a
skilled artisan understanding element 13 in Figure 1 to be
a limit switch that activates the supplemental air pressure
providing device. *See* J.A. 2864–65. Yet neither the '979
patent nor the '847 application describes element 13 as a

limit switch.  And Dr. Stevick's testimony failed to provide any basis for his assertion.  *See Board Decision* at *23 ("Dr. Stevick provides no testimony in his declaration to support his opinion that item 13 represents a limit switch."); J.A. 2479 (opining that element 13 is a limit switch because "[w]hy else would you put it there?"); *see also Board Decision* at *24.

Having construed "pressure controlling assembly" as not limited by any disclosed structure in the '979 patent (at least as to the required function of "automatically activat[ing] the supplemental air pressure providing device"),[5] the Board returned to determining whether the '847 application provided written description support for that claim limitation such that the challenged claims could rely on the '847 application's priority date and thereby render the '979 patent ineligible for post-grant review.  *See Board Decision* at *24–26.  For reasons similar to its finding that the '979 patent failed to describe corresponding structure for the "pressure controlling assembly," the Board found that the substantively identical '847 application lacked the written description needed to establish that the inventors were in possession of a "pressure controlling assembly" that "automatically activates [a] supplemental air pressure providing device.'"  *See id.* at *26 ("We do not agree with Patent Owner that the cited sections of the '847 application disclose to a [skilled artisan] that limit switches are used by the 'pressure controlling assembly' to automatically operate the supplemental air pressure providing device.").

---

5    *See, e.g.*, *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519 (Fed. Cir. 2012) ("There is therefore nothing in the specification to help cabin the scope of the functional language in the [pressure controlling assembly] element: The patentee has in effect claimed everything that [may automatically activate a supplemental air pressure providing device] under the sun.").

Thus, the Board found that the '979 patent was eligible for post-grant review. *See id.* ("Accordingly, we find that a [skilled artisan] would not have understood that the patentee was in possession of an invention where item 121 and element 122 (and other depicted, but not described, items in the figures of the '847 application) form an assembly that can perform all of the recited functions of the pressure controlling assembly.").[6]

Based on the foregoing analysis, the Board concluded that challenged claims 1–5 were (1) eligible for post-grant review, (2) unpatentable as indefinite under § 112(b) for

---

[6] While the Board observed that the patentee's amendment to the '979 specification added a detail that the '847 application had not expressly stated in that it associated elements 121 and 122 with the pressure controlling assembly, the Board's rejection of TWW's priority claim makes clear that it did not rely on that amendment—or any arguments related to new matter being added to the '979 patent specification—to reach its no priority conclusion. In the same vein as its indefiniteness analysis for "pressure controlling assembly," the Board found that the '847 parent application, like the '979 patent specification, "fails to demonstrate that the inventors were in possession of a 'pressure controlling assembly' that 'automatically activate[s] the supplemental air pressure providing device' as required by claim 1." *See Board Decision* at \*25. Moreover, the Board separately concluded that the '979 patent— which contains the added disclosure associating elements 121 and 122 with the pressure controlling assembly—also lacked written description support for the pressure controlling assembly. *See id.* at \*29. Thus, even assuming the '847 application was originally filed with the matter subsequently included via amendment, the Board's conclusion that it did not provide written description support for the claims of the '979 patent would have been unchanged.

TEAM WORLDWIDE CORPORATION v.                    11
INTEX RECREATION CORP.

failing to disclose structure for performing each of the re-
cited functions for the claimed pressure controlling assem-
bly, and unpatentable for failure to meet the written
description requirement under § 112(a). *See id.* at \*26–27,
29.

TWW timely appealed. We have jurisdiction under 28
U.S.C. § 1295(a)(4)(A).

DISCUSSION

TWW raises numerous challenges to the Board's un-
patentability determination. The thrust of TWW's argu-
ments is that the Board erroneously construed "pressure
controlling assembly" as invoking § 112(f) and, even if so
construed, erred in determining that the '979 patent fails
to disclose sufficient structure to perform its claimed func-
tions, thereby rendering the claims indefinite. As TWW's
arguments as to how the '979 patent or '847 application
provide written description support for the "pressure con-
trolling assembly" are the same as its indefiniteness argu-
ments, we, like TWW, treat the issue of eligibility for post-
grant review as rising or falling with the § 112(b) issues.[7]
Thus, we consider whether the Board erred in construing
"pressure controlling assembly" as a means-plus-function
limitation invoking § 112(f) and determining that the '979
patent fails to describe structure to perform each of its re-
cited functions.

A

We review issues of claim construction, including
whether a claim term invokes § 112(f), de novo. *See*

---

[7]   *See, e.g.*, Appellant's Br. 54–55; Oral Arg. at 2:05–
2:55 (acknowledging that TWW's "argument about the un-
availability of [post-grant review] process here rests en-
tirely on [TWW's] argument about the inapplicability or
satisfaction of 112(f)").

*Williamson*, 792 F.3d at 1346. The Board's factual findings underlying this inquiry are reviewed for substantial evidence. *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019).

TWW argues the Board erred in construing the term "pressure controlling assembly" as invoking § 112(f). Our law states that if a claim limitation uses the word "means," this creates a rebuttable presumption that § 112(f) applies. *Williamson*, 792 F.3d at 1348. The converse is also true: if a claim limitation does not use the word "means," a rebuttable presumption arises that the claim does not invoke § 112(f). *Id.* As the claimed "pressure control assembly" does not use the word "means," we begin our analysis with the presumption that it does not invoke § 112(f).

With that starting point, we next turn to the "essential inquiry" of "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* When a claim term lacks the word "means," the presumption against the application of § 112(f) will be overcome "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* A "critical question" underlying this inquiry "is whether the claim term is used in common parlance or by [skilled artisans] to designate structure, including either a particular structure or a class of structures." *MTD Prods.*, 933 F.3d at 1341.

We begin by reviewing the Board's analysis of the intrinsic record, starting with the claim, then the specification and prosecution history. As to the claim term itself, we find no error in the Board's determination that the claims do not recite sufficient, definite structure to perform the functions of the "pressure controlling assembly." Claim 1 requires the "pressure controlling assembly" to perform several functions, e.g., monitoring the air pressure and

activating the supplemental air pressure providing device, but does not describe any structure for performing those functions. *See* '979 patent at claim 1. As in *Williamson*, the relevant portions of the claim—here, references to pressure controlling assembly—are written "in a format consistent with traditional means-plus-function claim limitations" by replacing the term "means" with "assembly" and then reciting four functions performed by the assembly. *See* 792 F.3d at 1350. We have previously recognized that the word "assembly" used with functional descriptors is "similar to other generic, black-box words that this court has held to be nonce terms similar to 'means' and subject to § 112, ¶6." *MTD Prods.*, 933 F.3d at 1343. Like the claim term "mechanical control assembly" in *MTD Products*, "the claim language reciting what the [pressure] control[ing] assembly is 'configured to' do is functional," and thus the claim format supports the applicability of § 112(f). *Id.* at 1343. *See also Mass Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (construing "colorant selection mechanism" as a means-plus-function limitation); *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1325 (Fed. Cir. 2004) (same for "control mechanism"). And while "the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions," *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018), the generic term "assembly" preceded by the functional descriptor— "pressure controlling"—supports a conclusion that the term itself is purely functional. *See Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1213 (Fed. Cir. 1998) (noting that "lever moving element" is "drafted as a function to be performed rather than definite structure or materials" and therefore was properly construed as a means-plus-function element).

And we agree with the Board that nothing in the specification provides a structural definition for the "pressure controlling assembly" or indicates the patentee acted as a

lexicographer to define the term. *See Board Decision* at \*13 (explaining that the specification's "mere reference to items 121 and 122, without further description, does not convey that the *term* 'pressure controlling assembly' itself connotes sufficient structure"). Additionally, the Board did not err in relying on *MTD Products* to conclude that any structure arguably disclosed in the specification via an embodiment cannot support a finding that the claim term itself connotes a specific structure. *Id.*; *see also MTD Prods.*, 933 F.3d at 1343 ("[A] preferred embodiment disclosed in the specification cannot impart structure to a term that otherwise has none.").

The prosecution history of the '979 patent also fails to provide support for TWW's argument that a skilled artisan would understand "pressure controlling assembly" to connote a particular, definite structure or class of structures. TWW argues that the examiner's citation to pressure sensors in various prior art references during prosecution as disclosing the "pressure controlling assembly" limitation is evidence that a skilled artisan would understand that term to define structure. *See* Appellant's Br. 27–31. We are unpersuaded. TWW cites no authority to support this argument. *See id.* Nor does it explain why an examiner's ability to recognize that a pressure sensor in the prior art may perform some of the stated *functions* of the "pressure controlling assembly" is evidence that the term itself connotes *structure*.[8]

---

8    We also reject TWW's argument that the examiner's silence during prosecution with respect to applicability of § 112(f) to "pressure controlling assembly" is entitled to weight in our analysis. *See* Appellant's Reply Br. 5 n.2; Oral Arg. at 5:37–7:25. In addition to forfeiting this argument by failing to raise it in its opening brief, *see SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006), TWW fails to cite any authority that

We next review the Board's determination that the extrinsic evidence failed to show that the term "pressure controlling assembly" is used in common parlance by skilled artisans in the relevant field. *See Board Decision* at \*14. We see no error in the Board's analysis and find its factual determinations supported by substantial evidence.

We agree with the Board that TWW's expert's testimony that "pressure controlling assembly" "is descriptive" to a skilled artisan is conclusory and unsupported by the evidence of record. *See id.* We see no error in the Board's determination that the dictionary definition of "pressure control" relied upon by Dr. Stevick—"Any device or system able to maintain, raise, or lower pressure in a vessel or processing system," J.A. 2936—"provides no insight into whether . . . 'pressure controlling assembly' is used in common parlance," "is provided in functional terms," and states "'[a]ny device or system' which, together with the functional language, suggests the 'black-box nature' of the term." *Board Decision* at \*15.

We also agree with the Board that purported admissions by Intex's expert, Dr. Kuchel, do not militate against the applicability of § 112(f). TWW argues that Dr. Kuchel's "admissions" (that (1) the "pressure controlling assembly" "connote[s] that it controls pressure and it's an assembly," (2) devices exist that sense or control pressure, and (3) a prior art reference depicted "an apparatus that controls the pressure") weigh against invoking § 112(f) in the instant case. *See* Appellant's Br. 31–33; *Board Decision* at \*15. At best, Dr. Kuchel's statements are evidence that a skilled artisan would have known that devices existed that can

an examiner's silence as to whether a given term invokes § 112(f) is entitled to weight in a subsequent judicial determination, regardless of whether the examiner recognized that a different term in the patent—"noise silencing means"—invoked § 112(f).

perform the functions of the claimed "pressure controlling assembly." That is not the relevant inquiry, however, and we see no reason to override the Board's well-supported factual determination that "the cited testimony from Dr. Kuchel does not support an opinion that the term 'pressure controlling assembly' is used in common parlance or by [skilled artisans] to designate a particular structure or class of structures." *Board Decision* at *15.

The Board's conclusions with respect to TWW's smattering of prior art references referring to "pressure control assembl[ies]" are also supported by substantial evidence. We see no error in the Board's determination that:

> Even if the use of the term "pressure controlling assembly" or "pressure control assembly" reflected a designation of structure, the extrinsic record demonstrates, at best, that the term is used as a descriptive term across a broad spectrum of industries, having a broad range of structures. The record does not include sufficient evidence to demonstrate that the term "pressure controlling assembly" is used in common parlance or used to designate a *particular* structure by a person having ordinary skill in the art of the '979 patent.

Board Decision at *17.

In light of the above, we find that the Board properly construed "pressure controlling assembly" as a means-plus-function claim limitation.

## B

Having found § 112(f) applicable to the claimed "pressure controlling assembly," we now turn to its construction. As we stated in *Williamson*:

> Construing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine

> what structure, if any, disclosed in the specification
> corresponds to the claimed function. Where there
> are multiple claimed functions, as we have here,
> the patentee must disclose adequate corresponding
> structure to perform all of the claimed functions. If
> the patentee fails to disclose adequate correspond-
> ing structure, the claim is indefinite.

792 F.3d at 1351–52 (internal citations omitted).

The four functions identified by the Board for the "pres-
sure controlling assembly," *see Board Decision* at *20, are
undisputed on appeal. Accordingly, the only question is
whether the '979 patent discloses sufficient structure to
perform each of them.

We agree with the Board that the patent fails to dis-
close structure for at least one function—"automatically ac-
tivat[ing] the supplemental air pressure providing device."
*See Board Decision* at *23. TWW's arguments rely exclu-
sively on Dr. Stevick's conclusory testimony about how a
skilled artisan would interpret Figures 1 and 2a in the '979
patent. Dr. Stevick contends that a skilled artisan would
recognize that elements 121 and 122 in Figure 2a interact
with element 13 shown in a different figure, Figure 1,
which he asserts is a "limit switch" that activates the sup-
plemental air pressure providing device. *See* J.A. 2864.
Yet nothing in the patent describes element 13 as a switch
or describes it being connected to element 121 and 122 or
the supplemental air pressure providing device. Nor does
Dr. Stevick ever provide a non-conclusory explanation as to
why a skilled artisan would understand element 13 to be a
limit switch or how it connects to elements 121 and 122 or

the supplemental air pressure providing device. *See Board Decision* at *26.[9]

We also agree with the Board that the CN '302 application's disclosure cannot save these claims. TWW argues that because the original Chinese-language version of the CN '302 application was submitted by the applicant during prosecution, it is part of the prosecution history and, per *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1424 (Fed. Cir. 1997), may be relied upon to link or associate structure to the function recited in the claim. *See* Appellant's Br. 43–44. TWW's reliance on *B. Braun* is misplaced. *B. Braun*'s reference to the "prosecution history" has been understood by our court to mean that *affirmative statements* by the applicant during prosecution may clearly link or associate corresponding structure with a recited function—not that the content of *any document or reference* submitted during prosecution, without more, may satisfy the patentee's duty. *See, e.g.*, *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313–14 (Fed. Cir. 2001) (analyzing the applicant's statements in a preliminary amendment); *Overhead Door Corp. v. Chamberlain Grp., Inc.*, 194 F.3d 1261, 1272 (Fed. Cir. 1999) (finding the "patentees' representation to the Patent and Trademark Office in its . . . sworn declaration indicated their intent to include the algorithm of Figure 3 as a 'corresponding structure' for the switch means"). TWW directs us to no such statements, and we decline to hold that a Chinese-language priority document, whose potentially relevant disclosure was omitted from the United States patent application family, provides a clear link or association between the claimed "pressure controlling assembly" and any structure recited or disclosed in the '979 patent.

---

[9]    We further note that the '979 patent associates only elements 121 and 122 in Figure 2 with the "pressure controlling assembly"—not element 13.

CONCLUSION

We have considered TWW's remaining arguments and find them unpersuasive. For the reasons set forth above, we affirm the Board's decision finding claims 1–5 of the '979 patent unpatentable as indefinite under § 112(b).[10]

**AFFIRMED**

---

[10]   As we affirm the unpatentability of the challenged claims under § 112(b), we need not reach the Board's alternative unpatentability finding based on § 112(a).